# United States District Court
### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| EARLINE LAHMAN, RANDY | § | |
| LAHMAN, and NATIONWIDE | § | |
| PROVIDER SOLUTIONS, LLC, | § | Civil Action No.  4:17-cv-305 |
| *Plaintiffs*, | § | Judge Mazzant |
| | § | |
| v. | § | |
| | § | |
| CAPE FOX CORP., NAVAR, INC., CAPE | § | |
| FOX SHARED SERVICES, and | § | |
| MICHAEL BROWN, | § | |
| *Defendants*. | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Pending before the Court is Defendants' Motion for Summary Judgment and Brief in Support (Dkt. #139).  After consideration, the Court is of the opinion that Defendants' Motion for Summary Judgment and Brief in Support (Dkt. #139) should be **GRANTED.**

## BACKGROUND

### I.    Factual Summary

This case concerns a failed business association.  On December 11, 2007, Mrs. Earline Lahman founded Nationwide Provider Solutions, LLC ("Nationwide Provider"), a Medical Service Organization, to help physicians and health care providers with medical billing and credentialing.  Mrs. Lahman aspired to grow Nationwide Provider's client-base by adding private parties, the U.S. Department of Veteran Affairs' Division of Health Affairs, U.S. Department of Health, U.S. Indian Health Affairs, and Texas state and local health providers in the Paris, Texas region.

On March 16, 2011, Nationwide Provider obtained a U.S. General Services Administration Schedule Contract Vehicle, allowing it to bid for federal government contracts ("Government

Services Contract Vehicle").  Nationwide Provider also received 8(a) and 8(m) status from the Small Business Administration ("SBA").  The 8(a) Business Development Program helps small, disadvantaged businesses secure government contracts.  Meanwhile, the 8(m) Program promotes Women-Owned Small Businesses—businesses with at least fifty-one percent (51%) direct female ownership and control.  As a company with 8(a) and 8(m) status and a Government Services Contract Vehicle, Nationwide Provider was one of nine businesses able to bid for federal agency contracts through multiple contract vehicles in the Paris, Texas region.  In June 2011, Nationwide Provider received certification from the State of Texas Comptroller of Public Accounts as a certified Historically Underutilized Business and its accompanying state contracting advantages. Nationwide Provider's right to bid on federal agency contracts in the Paris, Texas region and help federal agencies meet their stated goal of awarding five percent (5%) of their contracts to Women-Owned Small Businesses helped make it valuable.

A year later, Mrs. Lahman's husband, Randy Lahman, fell thirty feet onto concrete when a tree limb struck a lift he was using.  From July 2012 through March 2015, Mr. Lahman underwent six surgeries for his injuries, four of which were on his spine.  Mr. Lahman's medical expenses and his lost income put a severe emotional and financial strain on his family and Nationwide Provider.  Mrs. Lahman continued to run Nationwide Provider, but in time she recognized that she and Nationwide Provider needed some outside help.

The 8(a) Program has a Mentor-Protégé Program, permitting young 8(a) companies to learn from other more experienced businesses. The SBA's Mentor-Protégé Program not only provides needed support, advice, and resources for the protégé 8(a) company but also permits the mentor and protégé to enter into joint venture arrangements where the mentor may buy up to forty percent

(40%) of the protégé in order to help the protégé raise capital.  Mrs. Lahman began searching for a mentor company in early 2012.

In March 2012, Mrs. Lahman connected with Kay Bills, the head of Mid America Government Industry Coalition, Inc. ("MAGIC").  MAGIC is a regional trade association for growing businesses involved with Federal Contracting in Oklahoma, Texas, New Mexico, and Colorado.  On September 4, 2012, Ms. Bills introduced Mrs. Lahman via e-mail to Michael Brown, Chief Executive Officer ("CEO") of Cape Fox Corporation ("Cape Fox"), an Alaskan Native Corporation formed under the Alaska Native Claims Settlement Act, as a potential mentor for Nationwide Provider.  In that e-mail, Mrs. Lahman summarized Nationwide Provider's history and goals for growth with Mr. Brown.  The following day, Mr. Brown telephoned Mrs. Lahman to schedule a face-to-face meeting.

That meeting took place in Paris, Texas on September 26, 2012.  Attending the meeting were Mrs. Lahman; Mr. Brown; George Bernardy, Cape Fox's Chief Financial Officer; and Charles Johnson, the CEO of Navar, a wholly owned Cape Fox subsidiary.  In order to discuss the details and business plan of Nationwide Provider more fully and candidly, Mrs. Lahman and Mr. Brown signed a mutual non-disclosure agreement.  At the meeting's conclusion, Mr. Brown and Mr. Bernardy told Mrs. Lahman about their plan for Cape Fox to buy Nationwide Provider.

On October 2, 2012, William K. Walker, Cape Fox's General Counsel, expressed his enthusiasm for Cape Fox to quickly purchase Nationwide Provider in a letter to Mrs. Lahman (the "Interest Letter"), as then-President of Nationwide Provider.  The Interest Letter outlined the initial terms of what would be Cape Fox's forthcoming offer.  The Interest Letter indicated that Cape Fox contemplated an offer that would include the following terms: (i) Cape Fox would acquire a 100% membership interest in Nationwide Provider; (ii) Mrs. Lahman would be employed as CEO of

Nationwide Provider and would receive a reasonable and regular salary paid against a bonus pool to her of 49% of its net profits; (iii) Cape Fox would assume existing third-party debts and hold the Lahmans harmless for the same; (iv) Mrs. Lahman would receive $50,000 upon SBA approval of the transaction in retirement of her personal loan to Nationwide Provider; and (v) Mrs. Lahman's receipt of net profits would continue for at least five (5) years with two-year (2-year) options to extend (Dkt. #139-2, pp. 206–09). The Interest Letter also indicated that a Letter of Intent would be forthcoming.

On November 14, 2012, Cape Fox and Nationwide Provider recorded the terms and conditions for Cape Fox's anticipated purchase of Nationwide Provider in a Letter of Intent in Manassas, Virginia (Dkt. #139-2, pp. 211–14). Mr. Brown signed this letter on Cape Fox's behalf. Mrs. Lahman agreed to and acknowledged the Letter of Intent on November 14, 2012; Mr. Lahman did so on November 19, 2012. *Id.* The Letter of Intent conditioned Cape Fox's purchase of Nationwide Provider on the SBA's approval of the transaction and left the purchase price open for future negotiation. The Letter of Intent also included certain conditions that the parties had to satisfy in order to complete the purchase of Nationwide Provider (Dkt. #95, ¶¶ 32–33).

Also on November 14, 2012, Mrs. Lahman and Nationwide Provider executed an employment agreement (the "First Employment Agreement") (Dkt. #139-2, pp. 216–23). The First Employment Agreement provided that Nationwide Provider would employ Mrs. Lahman as CEO of Nationwide Provider for an initial term of five (5) years, beginning January 1, 2013 and ending December 31, 2017. *Id.* at 216. Mrs. Lahman would receive a base salary of $75,000 and would receive certain fringe benefits. *Id.* at 216–17. Moreover, the First Employment Agreement provided that Nationwide Provider could terminate Mrs. Lahman without cause, subject to her receiving certain severance benefits. *Id.* at 220. Specifically, if Mrs. Lahman were terminated

4

without cause, she would continue to receive here base salary for a period of six (6) months following her termination and would be entitled to continue receiving certain fringe benefits. *Id.* The First Employment Agreement also contained a choice of law provision choosing Alaska law as the governing law, and it included an arbitration provision. *Id.* at 222. The First Employment Agreement provided that it contained "the entire understanding between the parties hereto and supersedes any prior written or oral agreements between them respecting the subject matter hereof." *Id.* at 223. Finally, the First Employment Agreement provided that it "may be amended only by a writing signed by [Mrs. Lahman] and by a representative of [Nationwide Provider] other than [Mrs. Lahman], duly authorized by the Board." *Id.* at 223. Mr. Brown signed on behalf of Nationwide Provider, and Mrs. Lahman signed on behalf of herself. *Id.* at 223. At this time, the SBA had not yet approved the purchase of Nationwide Provider by Cape Fox.

On December 12, 2012, the parties executed the Secured Finance Agreement (Dkt. #139-2, pp. 225–26). The Secured Finance Agreement was executed pursuant to ongoing negotiations between Cape Fox and Nationwide Provider regarding the sale of Nationwide Provider. The Secured Finance Agreement provided that Cape Fox would advance Nationwide Provider $50,000 that would function as an early withdrawal from the purchase price to be paid by Cape Fox upon the consummation of the purchase of Nationwide Provider. *See id.* The Secured Finance Agreement gave Cape Fox the right to place a lien on Nationwide Provider's property for $50,000 or otherwise recoup the same in the event the transaction was not consummated. *Id.* On December 12, 2012, Mr. Brown signed the Secured Finance Agreement on behalf of Cape Fox; that same day, Mr. and Mrs. Lahman signed on behalf of Nationwide Provider. *Id.*

In early January 2013, Cape Fox sent an Agreement for Purchase and Sale of Membership Interests of Nationwide Provider (the "Purchase Agreement") to Mrs. Lahman and Mr. Lahman

(Dkt. #139-2, pp. 235–41).  The Purchase Agreement provided for Cape Fox's purchase of 100% of the membership interest in Nationwide Provider in exchange for the following consideration: (i) at *closing*, Cape Fox was responsible for paying the Lahmans $53,310.81, of which $50,000 had already been paid; (ii) Cape Fox would indemnify and hold harmless the Lahmans from all loans from third parties and all guarantees; (iii) the Lahmans would receive 49% of the net profits for the five-year (5-year) period ending December 31, 2017, with any compensation paid to the Lahmans pursuant to an employment agreement with Nationwide Provider acting as a draw against those net profit distributions; (iv) sixty (60) days prior to the expiration of the employment agreement between the Lahmans and Nationwide Provider, the Lahmans would have the option to renegotiate the employment agreement for a stated term and/or would have the option to negotiate for 49% of the book value of Nationwide Provider.  *Id.*

The Purchase Agreement constituted the entire agreement among the parties and superseded all prior and contemporaneous agreements and undertakings of the parties (Dkt. #139-2, p. 240).  Moreover, the Purchase Agreement stipulated that it "shall have no present effect and no enforceable legal rights are created arising from this Agreement prior to the approval of this Agreement by the [SBA]."  *Id.* at p. 239.  The Purchase Agreement provided that the "closing date" would occur "on or after January 1, 2013, and only after approval of this transaction by SBA."  *Id.*  On March 13, 2013, Mr. Brown signed the Purchase Agreement on behalf of Cape Fox; on March 14, 2013 both Mr. and Mrs. Lahman signed on behalf of Nationwide Provider.  *Id.* at 241.

On January 31, 2013, Plaintiffs allege that Cape Fox "drafted and insisted that [Nationwide Provider] sign a Contract for Administrative Services" (the "Administrative Services Contract") (Dkt. #95, p. 18).  Per the Administrative Services Contract, Cape Fox assumed operational control

of Nationwide Provider's accounting, finances, information technology, network management, and human resources (Dkt. #95, ¶ 50).

On September 11, 2013, Mr. Brown was contacted by an attorney from the SBA's Office of General Counsel. He was informed that the SBA had concerns about whether the terms of the Purchase Agreement met certain SBA requirements (Dkt. #139-5, p. 5 ¶12, p. 11). The SBA notified Mr. Brown that it would approve the sale of Nationwide Provider to Cape Fox only if the parties agreed to cap the maximum amount the Lahmans would receive as a profits share at $200,000 so that compensation was not excessive. *Id.* at 5 ¶ 12. In response to this, on September 16, 2013, the parties executed the First Amendment to Agreement for Purchase and Sale of Membership Interests (the "Purchase Agreement Amendment"). *Id.* at 15–16. The Purchase Agreement Amendment did indeed cap the maximum amount the Lahmans could receive as a profits share at $200,000. *Id.* at 16. On September 17, 2013, Mr. Brown signed on behalf of Cape Fox, and Mr. and Mrs. Lahman signed on behalf of Nationwide Provider. *Id.* Then on November 26, 2013, the SBA approved the change in Nationwide Provider's ownership to Cape Fox. *Id.* at 18.

On December 2, 2013, Mrs. Lahman received an offer of employment from Nationwide Provider (the "Second Employment Agreement") (Dkt. #139-2, pp. 259–60). The Second Employment Agreement provided, in relevant part, that (i) Mrs. Lahman would be Director of Operations for Nationwide Provider in Paris, Texas and report to Christopher Jones, the CEO; (ii) Mrs. Lahman would receive a salary of $75,000; (iii) Mrs. Lahman's start date would be December 2, 2013; and (iv) Mrs. Lahman's employment would be at-will and subject to termination at any time, with or without cause. *Id.* The Second Employment Agreement also contained the following provision: "by accepting our offer of employment, you certify your understanding that . . . neither

you nor any Company representatives have entered into a contract regarding the terms or the duration of your employment." *Id.*  Mrs. Lahman accepted and signed the Second Employment Agreement on December 2, 2013.  *Id.* at 260.

On January 31, 2014, the Lahmans officially transferred their membership interests in Nationwide Provider to Cape Fox (Dkt. #138-2, pp. 268–69).

Throughout 2014, Cape Fox began realizing that despite sustained business development efforts, Nationwide Provider was not servicing enough clients and generating sufficient revenue to cover costs.  Specifically, Nationwide Provider generated only about $22,000 in revenue in 2013 and was on track to generate only about $30,000 in 2014.  Mrs. Lahman's $75,000 annual salary vastly exceeded Nationwide Provider's expected annual revenue.  In response to this, on October 9, 2014, the new CEO of Cape Fox, Bernie Green, met with Mrs. Lahman and the new President of Nationwide Provider, Harold Mitchell, to discuss Nationwide Provider's performance and future.  At that meeting, Mr. Green and Mr. Mitchell informed Mrs. Lahman that, because of Nationwide Provider's lack of financial performance and financial losses, Cape Fox was ceasing Nationwide Provider's operation in Paris, Texas and moving its assets to Manassas, Virginia—the headquarters of Cape Fox's federal contracting group.  Mrs. Lahman expressed no interest in the relocation and, consequently, was terminated from Nationwide Provider effective October 15, 2014.  Mrs. Lahman received her salary and insurance benefits for six (6) months following her termination.

In November 2014, Cape Fox sent employees and a moving crew to the Nationwide Provider office in Paris, Texas—the property at 2031 Clarksville St., Paris, Texas 75460—to take the business records, medical records, and credentialing records, as well as computers, files,

property, and equipment belonging to Nationwide Provider, so that it could be relocated to Manassas, Virginia.  Then in December 2014, Cape Fox listed the Clarksville St. property for sale.

## II.     Procedural History

On June 26, 2018, Plaintiffs filed their Third Amended Complaint, alleging the following: (1) fraud; (2) misrepresentation; (3) breach of agreements of Cape Fox's purchase of Nationwide Provider; (4) breach of employment agreements; (5) that the Court should void the purchase/sale contract; (6) unconscionability; (7) quantum meruit; (8) unjust enrichment; (9) conversion; (10) trespass to real property; (11) tortious interference; (12) breach of fiduciary duty; (13) intentional infliction of emotional distress; (14) civil conspiracy; (15) single business enterprise liability; (16) liability arising from the existence of a joint enterprise and/or joint venture; and (17) violation of law regarding the handling of medical records (Dkt. #95).

On January 17, 2020, Defendants filed the present motion for summary judgment (Dkt. #139), seeking summary judgment on all causes of action in the Third Amended Complaint. Plaintiffs did not file a response.

### LEGAL STANDARD

The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).  Summary judgment is proper under Rule 56(a) of the Federal Rules of Civil Procedure "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  A dispute about a material fact is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986).  Substantive law identifies which facts are material.  *Id.*  The trial court

"must resolve all reasonable doubts in favor of the party opposing the motion for summary judgment." *Casey Enters., Inc. v. Am. Hardware Mut. Ins. Co.*, 655 F.2d 598, 602 (5th Cir. 1981).

The party seeking summary judgment bears the initial burden of informing the court of its motion and identifying "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" that demonstrate the absence of a genuine issue of material fact. FED. R. CIV. P. 56(c)(1)(A); *Celotex*, 477 U.S. at 323. If the movant bears the burden of proof on a claim or defense for which it is moving for summary judgment, it must come forward with evidence that establishes "beyond peradventure *all* of the essential elements of the claim or defense." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). Where the nonmovant bears the burden of proof, the movant may discharge the burden by showing that there is an absence of evidence to support the nonmovant's case. *Celotex*, 477 U.S. at 325; *Byers v. Dall. Morning News, Inc.*, 209 F.3d 419, 424 (5th Cir. 2000).

Once the movant has carried its burden, the nonmovant must "respond to the motion for summary judgment by setting forth particular facts indicating there is a genuine issue for trial." *Byers*, 209 F.3d at 424 (citing *Anderson*, 477 U.S. at 248–49). A nonmovant must present affirmative evidence to defeat a properly supported motion for summary judgment. *Anderson*, 477 U.S. at 257. Mere denials of material facts, unsworn allegations, or arguments and assertions in briefs or legal memoranda will not suffice to carry this burden. Rather, the Court requires "significant probative evidence" from the nonmovant to dismiss a request for summary judgment. *In re Mun. Bond Reporting Antitrust Litig.*, 672 F.2d 436, 440 (5th Cir. 1982) (quoting *Ferguson v. Nat'l Broad. Co.*, 584 F.2d 111, 114 (5th Cir. 1978)). The Court must consider all of the

evidence but "refrain from making any credibility determinations or weighing the evidence."
*Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007).

## ANALYSIS

Defendants seek summary judgment as to all causes of action asserted by Plaintiffs. Pursuant to Local Rule CV-7(d), because Plaintiffs did not respond to Defendants' summary judgment motion, the Court presumes that Plaintiffs "do[] not controvert the facts set out by [Defendants] and ha[ve] no evidence to offer in opposition to the motion."  Local Rule CV-7(d). In view of this standard, the Court will examine Defendants' motion as to each of Plaintiffs' causes of action.

## I.      Fraud and Misrepresentation

Defendants argue first that they did not commit fraud or make any material misrepresentations with respect to the Interest Letter, Letter of Intent, First Employment Agreement, Second Employment Agreement, Purchase Agreement, or Purchase Agreement Amendment.

To prevail on a fraudulent misrepresentation claim in Texas, the plaintiff must establish the following: "(1) a material misrepresentation (2) that was false (3) made with the knowledge that it was false or made recklessly without any knowledge of the truth and as a positive assertion (4) with the intention that it be acted upon by the other party (5) that the other party acted in reliance on the representation and (6) resulting injury."  *Siltek Grp. Texas, LLC v. A&A Landscape & Irrigation LP*, No. 05-17-00042-CV, 2018 WL 3342691, at *3 (Tex. App.—Dallas July 9, 2018) (citing *T. O. Stanley Boot Co. Inc., v. Bank of El Paso*, 847 S.W.2d 218, 222 (Tex. 1992)).  "A promise of future performance constitutes an actionable misrepresentation if the promise was made

with no intention of performing at the time it was made.  *See Formosa Plastics Corp. USA v. Presidio Eng'rs. and Contractors, Inc.*, 960 S.W.2d 41, 46 (Tex. 1998).

Similarly, to prevail on a cause of action for negligent misrepresentation in Texas, the plaintiff must show that "(1) the representation [was] made by a defendant in the course of his business, or in a transaction in which he ha[d] a pecuniary interest; (2) the defendant supplie[d] 'false information' for the guidance of others in their business; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; and (4) the plaintiff suffer[ed] pecuniary loss by justifiably relying on the representation."  *Fed. Land Bank Ass'n of Tyler v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1991).

A.     *Interest Letter and Letter of Intent*

It is not entirely clear from the Third Amended Complaint what specific acts or statements Plaintiffs are alleging were fraudulent or constituted misrepresentations.  The initial Interest Letter included certain terms that Cape Fox expected would become part of an eventual employment and/or purchase agreement: (i) Mrs. Lahman would remain CEO of Nationwide Provider; (ii) Mrs. Lahman would receive 49% of net profits for a five-year period following the acquisition; (iii) Cape Fox would assume all third-party debt and hold the Lahmans harmless for those debts; and (iv) Cape Fox would advance the Lahmans and Nationwide Provider $50,000 of the eventual purchase price (Dkts. #95; #139-2, p. 208).  The Letter of Intent that followed contained substantially the same terms as the Interest Letter, but it did not contain a purchase price and indicated that purchase of Nationwide Provider by Cape Fox would be consummated following approval of the transaction by the SBA.

There does not appear to be any evidence presented by Plaintiffs indicating that any Defendants made any statements or included any terms in the Interest Letter or Letter of Intent that

they knew at the time to be false.  Nor is there any evidence that any Defendants made positive assertions related to the same without any knowledge of their truth.  Moreover, Plaintiffs' failure to respond to Defendants' summary judgment motion creates the presumption that they have no such evidence.  Accordingly, with respect to the Interest Letter and Letter of Intent, the Court finds that there is no genuine issue of material fact as to whether Defendants made fraudulent misrepresentations.

Similarly, there is no evidence indicating that Defendants did not exercise reasonable care when communicating information to Plaintiffs.  Mrs. Lahman bases her misrepresentation claim primarily on Mr. Brown's alleged promise to keep her employed for at least five years following the purchase of Nationwide Provider.  But when pressed about that alleged promise, Mrs. Lahman was unable to provide any evidence that Mr. Brown, or any other Defendant, somehow failed to use reasonable care in his communications or that Mr. Brown and Cape Fox did not intend to follow through on that agreement (Dkt. #139-2, pp. 128–31).  And Mrs. Lahman acknowledged and accepted the terms of the First and Second Employment Agreements, which made explicit that she could be terminated at any time.  There was no term in the Interest Letter or Letter of Intent indicating that their terms would be identical to those contained in the forthcoming Purchase Agreement and First and Second Employment Agreements.  That those agreements provided that Mrs. Lahman's employment could be terminated at any time without cause is not evidence of a negligent misrepresentation.

Accordingly, without more, there is no genuine issue of material fact as to whether Defendants made negligent misrepresentations to Plaintiffs regarding the Interest Letter or Letter of Intent.

13

### B.    First and Second Employment Agreements

In the Third Amended Complaint, Plaintiffs also allege that Mr. Brown, improperly acting as Nationwide Provider, executed an employment agreement with Mrs. Lahman promising to employ her as CEO of Nationwide Provider for five years, pay her an annual base salary of $75,000, and pay her severance upon termination of their employment relationship.  Without examining here whether Mr. Brown or Cape Fox owned or was capable of controlling Nationwide Provider at the time, the Court finds that the First Employment Agreement did not contain any material misrepresentations.  Similar to the analysis in the preceding section, there is no indication whatsoever that Mr. Brown or Cape Fox did not intend to perform their side of the agreement. Indeed, they *did* perform their obligations under the First Employment Agreement (and, for that matter, the eventual Second Employment Agreement): Mrs. Lahman was paid a $75,000 salary, remained CEO of Nationwide Provider for over a year, and did receive severance pay and benefits following her termination.  Moreover, the First Employment Agreement provided for essentially at-will employment, meaning that Nationwide Provider retained the right to fire Mrs. Lahman at any time with or without cause (Dkt. #139-2, pp. 216–23).  In short, there is simply no evidence that Mr. Brown or Cape Fox, at the time the First Employment Agreement was executed, had any intention not to perform their obligations under the contract.

The same reasoning applies to the Second Employment Agreement.  That is, there is no evidence that Defendants had any intent not to perform their side of the bargain with respect to any terms in the Second Employment Agreement.  Because there is no genuine issue of material

14

fact as to whether there was fraudulent or negligent misrepresentation regarding the First or Second Employment Agreement, summary judgment is proper.

  *C. Purchase Agreement*

  The Third Amended Complaint also alleges that Defendants fraudulently and negligently made misrepresentations with respect to the Purchase Agreement.  Principally, but among other things, it alleges that "[Cape Fox's] leadership emphasized that [Cape Fox] would keep the majority of the jobs at [Nationwide Provider] in Paris, Texas.  This was an essential assurance and aspect that Ms. Lahman insisted upon to move forward with the acquisition of [Nationwide Provider] by [Cape Fox]" (Dkt. #95, ¶ 37).  Because Cape Fox ultimately ceased Nationwide Provider's operations in Paris, Texas and relocated to Manassas, Virginia, Plaintiffs claim Defendants' earlier assurance that they would not do so constituted a fraudulent and/or negligent misrepresentation.

  To the extent this promise was made, however, there is no evidence that it was false or that Cape Fox made it without intending to perform.  In fact, the evidence indicates that Cape Fox sought to capitalize on the Lahmans' Paris, Texas connections—that was what motivated Cape Fox to seek the acquisition in the first place.  It was only after Defendants realized that the Paris, Texas operations represented a financial dead end for the business that they decided to relocate operations to Manassas, Virginia.  Without more, the fact that Cape Fox ceased operations in Paris, Texas is not enough to create a genuine fact issue as to whether Defendants made fraudulent or negligent misrepresentations.

  Moreover, to the extent that Plaintiffs' fraudulent or negligent misrepresentation claims are based on Cape Fox's decision to keep the Liberty National Bank loans in Nationwide Provider's name or pay those loans off at a certain time, that claim also fails.  At the time negotiations were

taking place, Liberty National Bank held two loans to Nationwide Provider that were guaranteed by the SBA.  In the Purchase Agreement, Defendants agreed to "indemnify and hold harmless Sellers from all loans from third parties and all guarantees" (Dkt. #139-2, p. 236), which would include the Liberty National Bank loans.  And just days before signing the Purchase Agreement, Mrs. Lahman agreed to leave it to Cape Fox to determine how to handle the loans (Dkt. #139-2, pp. 72–74).

The Purchase Agreement did not contain any time restrictions for Defendants' payment of the loans.[1]  Nor did it contain any restrictions as to how those loans were to be paid off.  And by August 2015, Cape Fox had paid off the Liberty National Bank loans in their entirety.  The Court thus does not see any evidence as to how any of Defendants' actions or statements regarding the loans, nor their handling of the loans, could constitute fraudulent or negligent misrepresentation.  Even if Defendants handled the loans in a manner inconsistent with some previous oral agreement between the parties—with regard to timeliness of payments or otherwise—that agreement was displaced by the Purchase Agreement, which constituted the final agreement among the parties.  Not only that, there is no evidence presented indicating that Plaintiffs suffered any type of injury as a result of how or when Defendants paid off the loans.  The fact is that Defendants paid off the loans, satisfying their obligation under the Purchase Agreement to indemnify and hold the Lahmans and Nationwide Provider harmless for all loans from third parties.  Accordingly, without more, there is no genuine issue of material fact as to Plaintiffs' fraudulent or negligent misrepresentation claims with respect to the Purchase Agreement.

---

[1] Indeed, Plaintiffs appear to suggest at times in the Third Amended Complaint that the Purchase Agreement was not effective or did not officially close until Defendants paid off the Liberty National Bank loans in their entirety. However, nothing in the summary judgment record indicates that the SBA's approval of Cape Fox's purchase of Nationwide Provider was somehow conditioned on the Liberty National Bank loans being paid off entirely by a certain date.  The Purchase Agreement does not contain any time restrictions related to the payment of the Lahmans' then-existing third-party debts.

D.      *Purchase Agreement Amendment*

Finally, Plaintiffs claim that Defendants made fraudulent and/or negligent misrepresentations with respect to the Purchase Agreement Amendment.  The Amendment capped the Lahmans' 49% share of Nationwide Provider's profits at $200,000, pursuant to the SBA's directive as a prerequisite for it approving the transaction (Dkt. #139-5, pp. 15–16).

The parties agree that, as provided in the Purchase Agreement, the transaction was conditioned expressly on the SBA's approval of the same (Dkt. #139-2, p. 235).  In 2013, an attorney for the SBA notified Mr. Brown that she would recommend approval only if the parties agreed to cap the Lahmans' share of profits at $200,000 (Dkt. #139-5, ¶ 12).  But the parties *did not know* at the time the Purchase Agreement was negotiated and signed that the SBA would impose such a requirement.  *Id.*  Thus, the Purchase Agreement Amendment does not support a fraudulent or negligent misrepresentation claim.  Indeed, the Purchase Agreement Amendment reflected Defendants' effort to perform their obligations—that is, to ensure that the purchase of Nationwide Provider received approval by the SBA, as required under the Purchase Agreement before it could take effect.  There is no evidence suggesting Defendants had any fraudulent or negligent intent, nor is there any evidence that they did not use reasonable care.  Thus, there is no genuine issue of material fact as to whether Defendants made fraudulent or negligent misrepresentations regarding the Purchase Agreement Amendment.

Because there is no genuine issue of material fact as to whether Defendants made fraudulent or negligent misrepresentations regarding the Interest Letter, the Letter of Intent, the First or Second Employment Agreement, the Purchase Agreement, or the Purchase Agreement Amendment, summary judgment is proper as to Plaintiffs' fraudulent and/or negligent misrepresentation claims.

## II.      Breach of Purchase and Employment Agreements

Next, Plaintiffs claim that Defendants breached both the Purchase Agreement and First Employment Agreement.  In Alaska,[2] to prevail on a claim for breach of contract, the plaintiff must establish the following: "an offer encompassing all essential terms, unequivocal acceptance by the offeree, consideration, and an intent to be bound."  *Young v. Kelly*, 334 P.3d 153, 157 (Alaska 2014).  Once a contract has been formed, "any failure to perform those duties amounts to a breach of contract."  *Am. Computer Inst., Inc. v. State*, 995 P.2d 647, 651 (Alaska 2000).

### A.      Purchase Agreement

The Purchase Agreement, which was signed by Mr. Brown on March 13, 2013 and by the Lahmans the following day (Dkt. #95, ¶54), set out the duties and obligations of the parties regarding the purchase of Nationwide Provider by Cape Fox.  Plaintiffs do not identify explicitly the specific provisions of the Purchase Agreement that they allege Defendants breached, but Defendants claim they furnished all consideration owed under Section 3 of the contract.  Specifically, pursuant to Section 3(a), Defendants assert that they paid more than the agreed-upon purchase price of $53,310.81.  These payments included an initial $50,000 advance in 2012 before the Purchase Agreement was executed and certain subsequent payments throughout 2013 after the Purchase Agreement was executed but prior to closing.  *See, e.g.*, (Dkt. #139-3, pp.9).  Moreover,

---

[2] "A federal court is required to follow the choice of law rules of the state in which it sits."  *Resolution Tr. Corp. v. Northpark Joint Venture*, 958 F.2d 1313, 1318 (5th Cir. 1992) (citing *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)).  "Under the Texas rules, in those contract cases in which the parties have agreed to an enforceable choice of law clause, the law of the chosen state must be applied."  *Id.* (citing *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 678 (Tex. 1990)).  Because the Purchase Agreement and First Employment Agreement choose Alaska law to govern, the Court applies Alaska law.  *See* (Dkt. #139-2, pp. 222, 240).

pursuant to Section 3(b), Defendants assert that they paid off entirely Nationwide Provider's SBA-guaranteed loans with Liberty National Bank.

In Section 3(c), Cape Fox agreed to pay the Lahmans 49% of the net profits of Nationwide Provider over a 5-year period ending December 31, 2017.  According to Defendants' motion, Nationwide Provider did not generate a profit during the period in question, however, and the Lahmans do not contend otherwise.  Thus, Defendants' position is that no monies were owed under Section 3(c).  Finally, in Section 3(d), the parties agreed that sixty (60) days prior to the expiration of the First Employment Agreement, they would negotiate and discuss, at the Lahmans' request, an extension of the employment term or payment of an amount reasonably equal to 49% of the book value of Nationwide Provider.  Defendants contend that Mrs. Lahman's termination occurred well before the expiration of the employment term, thus there was no reason for negotiation of any kind.  In addition, Defendants contend that the Lahmans never initiated negotiations relating to an extension of the employment term and never requested a determination of Nationwide Provider's book value, as it was their obligation to do under Section 3(d) if they so desired.

After consideration, there is no evidence suggesting that Defendants failed to comply with any of their obligations under the Purchase Agreement.  Rather, the evidence suggests that Defendants furnished all required consideration and complied with all obligations under the Purchase Agreement.  Accordingly, there is no genuine issue of material fact as to whether Defendants breached the Purchase Agreement.

B.      *First Employment Agreement*

The Third Amended Complaint alleges that "Defendant CFC proposed, drafted and signed Employment Agreements to employ Plaintiff Earline Lahman"; that the "terms and conditions of the employment agreement were agreed upon and include, but are not limited to, those terms and

19

conditions described in Paragraphs 34 and 64-71"; that "Defendant CFC breached the agreements"; and that "Plaintiffs sustained damages as a result of the breach" (Dkt. #95, ¶¶101–04).  In fact, the only Paragraphs in the Third Amended Complaint that discuss the terms of any employment agreements are Paragraphs 34, 68, and 71.  And only in Paragraphs 68 and 71 do Plaintiffs take issue with the terms.

In particular, Plaintiffs appear to consider Mrs. Lahman's change in title from CEO, as provided in the First Employment Agreement, to Director of Operations, as provided in the Second Employment Agreement, to be a breach of contract.  While the Court is dubious about whether the First Employment Agreement was an enforceable contract in the first place, as Mr. Brown may not have been legally authorized to act and sign on behalf of Nationwide Provider at the time, even if it were enforceable, it appears that the Second Employment Agreement was at a minimum an amendment to the First Employment Agreement.

Specifically, the First Employment Agreement provided that it could be amended only by a writing signed by Mrs. Lahman and a Nationwide Provider representative other than Mrs. Lahman.  The Second Employment Agreement constituted such a writing—it set out the terms of her employment with Nationwide Provider, just as the First Employment Agreement did, and it made a slight modification to her title.  Because the Second Employment Agreement was signed both by Mrs. Lahman and a Nationwide Provider representative who was not Mrs. Lahman, the Court sees no reason why the Second Employment Agreement was not a perfectly valid modification or amendment to the First Employment Agreement.  Thus, Defendants did not breach the First Employment Agreement by employing Mrs. Lahman as Director of Operations of Nationwide Provider nearly a year after first employing her as its CEO.[3]

---

[3] And Alaska Statute § 45.02.209(a) provides that contract modifications need not be supported by consideration to be binding.

In addition to the fact that the Second Employment Agreement was a valid modification or amendment to the First Employment Agreement, and thus not a breach thereto, Plaintiffs have also failed to provide any evidence whatsoever that Mrs. Lahman's change in title from CEO to Director of Operations under the Second Employment Agreement caused her any damages.  Not only did Mrs. Lahman acknowledge and agree to the change in title, but she received the same salary and the same benefits.  Moreover, the terms of her employment were effectively the same: while the First Employment Agreement specifically provided for a 5-year employment term whereas the Second Employment Agreement did not, both agreements allowed Nationwide Provider to terminate her employment at any time without cause.  Thus, in this regard, there was no meaningful change in her employment term.

Finally, Defendants did not breach either the First or the Second Employment Agreement by terminating Mrs. Lahman's employment with Nationwide Provider on October 15, 2014.  Both agreements authorized Nationwide Provider to terminate Mrs. Lahman without cause, subject to her receipt of certain severance benefits.  And Mrs. Lahman continued to receive her salary and certain benefits for six (6) months following her termination.  Thus, Mrs. Lahman's termination is no basis for a breach of contract claim.

Accordingly, there is no genuine issue of material fact as to whether Defendants breached the First or Second Employment Agreement.  Summary judgment is therefore proper.

## III.    Declare Purchase Agreement Void

Plaintiffs next ask the Court to declare the Purchase Agreement void by virtue of Defendants' alleged non-performance—that is, because they failed to pay complete consideration for ownership of Nationwide Provider and otherwise fulfill their pre-closing obligations.  As discussed in the preceding section, however, the evidence suggests that Defendants complied with

all of their pre-closing obligations under the Purchase Agreement.  And Plaintiffs have no evidence indicating otherwise.

The Purchase Agreement expressly provided that closing would occur "on or after January 1, 2013, and only after approval of this transaction by the SBA" (Dkt. #139-2, p. 239).  The SBA approved the transaction on November 26, 2013 (Dkt. #139-5, p. 18).  Moreover, as discussed above, Defendants performed all of their pre-closing obligations under the Purchase Agreement by paying full consideration.

And by January 31, 2014, the Lahmans had transferred their membership interests in Nationwide Provider to Cape Fox.  The evidence thus indicates that the Lahmans themselves recognized the existence of a valid Purchase Agreement.  Not only did they transfer their membership interests, as required under the Purchase Agreement in exchange for Defendants' consideration, but they reported the proceeds from the sale of the Nationwide Provider office on their 2013 federal income tax return.  Their conduct evinces their recognition of a valid sale.  This, in addition to the fact that Defendants performed all of their pre-closing obligations under the Purchase Agreement, is sufficient to persuade the Court that no genuine issue of material fact exists as to whether there was a valid sale.  The Purchase Agreement was and is not void, and summary judgment is therefore proper.

## IV.    Unconscionability

Plaintiffs next claim that certain terms of the Purchase Agreement and First Employment Agreement were "procedurally unconscionable upon execution, and are currently substantively unconscionable" (Dkt. #95, ¶ 112).  Plaintiffs allege only that the arbitration clause and choice of

law clause are unconscionable; they fail to identify specifically any other allegedly unconscionable provisions.

There is no clear definition of unconscionability under Alaska law.  However, courts have held that "unconscionability may exist where th[e] circumstances indicate a vast disparity of bargaining power coupled with terms unreasonably favorable to the stronger party."  *Municipality of Anchorage v. Locker*, 723 P.2d 1261, 1265–66 (Alaska 1986) (citing *Vochner v. Erickson*, 712 P.2d 379, 381–83 (Alaska 1986)).

As Defendants correctly observe, however, they do not seek to enforce the arbitration provision in the First Employment Agreement against Plaintiffs.  *See, e.g.*, (Dkt. #139-2, p. 222). Thus, the Court need not evaluate whether it is unconscionable.  With respect to the choice of law provisions in the First Employment Agreement and Purchase Agreement selecting Alaska law, *see* (Dkt. #139-2, pp. 222, 240), the Court sees no reason why they are unconscionable.  And notably, Plaintiffs fail to provide any reasons why they are.  Choice of law provisions are commonplace in contracts, and the Court declines here to interfere with the parties' freedom to contract for a certain state's law to govern their agreement.

Plaintiffs claim in the Third Amended Complaint that the allegedly unconscionable provisions of the First Employment Agreement and/or Purchase agreement include, *but are not limited to*, the arbitration clause and choice of law provision.  To the extent Plaintiffs claim that other, *unspecified* provisions in either the First Employment Agreement or Purchase Agreement are unconscionable, the Court will not consider them.  "It is not the obligation of the Court to make arguments on [the parties'] behalf, and find legal precedent to support those arguments, especially in light of the fact that [the parties] had ample time to brief the Court."  *Meier v. UHS of Delaware, Inc.*, 4:18-cv-00615, 2019 WL 6465314, at *8 (E.D. Tex. Dec. 2, 2019) (citing *Mendoza v. A&A*

*Landscape & Irrigation, LP*, No. 4:12-cv-562, 2013 WL 12403556, at *2 (E.D. Tex. Nov. 26, 2013)).

Accordingly, the Court finds that there is no genuine issue of material fact as to whether there were unconscionable terms—specifically, the arbitration clause and choice of law clause—in the First Employment Agreement and/or the Purchase Agreement.  Summary judgment is therefore proper.

## V.    Quantum Meruit and Unjust Enrichment

Plaintiffs next seek to recover in quantum meruit and for unjust enrichment.  Regarding quantum meruit, Plaintiffs claim that they provided their membership certificates and interest in Nationwide Provider to Cape Fox, "which had substantial value"; that Cape Fox "was reasonably aware that the Lahmans expected to be compensated for their membership certificates and interest"; and that, "[a]ccordingly, the Lahmans were deprived of the fair value of their membership certificates and interest" (Dkt. #95, ¶¶ 114–17).  With respect to unjust enrichment, Plaintiffs claim that Defendants "obtained and controlled [Nationwide Provider] through Fraud and taking of an undue advantage," and that "[f]ailure to allow the Plaintiffs to recover the value of [Nationwide Provider], all assets of [Nationwide Provider], and all gained through the wrongful use of [Nationwide Provider] by Defendants would result in the unjust enrichment of Defendants" (Dkt. #95, ¶¶ 119–20).

In Alaska, "[u]nder the doctrine of quantum meruit, when a valid contract does not exist, a plaintiff is entitled to 'the reasonable value of the services rendered to the defendant.'"  *Romero v. Cox*, 166 P.3d 4, 9 (Alaska 2007) (quoting *Krossa v. All Alaskan Seafoods, Inc.*, 37 P.3d 411, 419 (Alaska 2001)).

"Unjust enrichment exists where the defendant received a benefit from the plaintiff and it would be inequitable for defendant to retain the benefit without compensating plaintiff for its value." *Ware v. Ware*, 161 P.3d 1188, 1197 (Alaska 2007).  To recover for unjust enrichment, the plaintiff must establish the following: "(1) a benefit conferred upon the defendant by the plaintiff; (2) appreciation by the defendant of such benefit; and (3) acceptance and retention by the defendant of such benefit under such circumstances that it would be inequitable for him to retain it without paying the value thereof."  *Id.*  "[U]njust enrichment is not in and of itself a theory of recovery. Rather, it is a prerequisite for the enforcement of restitution; that is, if there is no unjust enrichment, there is no basis for restitution."  *Darling v. Standard Alaska Prod. Co.*, 818 P.2d 677, 680 (Alaska 1991) (citing *Alaska Sales & Serv., Inc. v. Millet*, 735 P.2d 743, 746 (Alaska 1987)).

First, Plaintiffs' attempt to recover in quantum meruit fails on its face.  The parties here *do* have a valid contract.  Moreover, Defendants paid full consideration to Plaintiffs for Plaintiffs' membership interests in Nationwide Provider, as provided in the Purchase Agreement.  Plaintiffs thus already received "the reasonable value of the services rendered to [Defendants]."  *See Krossa*, 37 P.3d at 419.

Plaintiffs' attempt to recover for unjust enrichment also fails.  "It is axiomatic that a party cannot be enriched at the expense of another for receipt of that to which the party is legally entitled."  *Alaska Sales & Serv.*, 735 P.2d at 747.  Upon paying full consideration and receiving SBA approval of the purchase of Nationwide Provider, as provided in the Purchase Agreement, Defendants were legally entitled to a 100% membership interest in Nationwide Provider.  Defendants received nothing from Plaintiffs that they were not legally entitled to; thus, Defendants were not enriched at Plaintiffs' expense.

Accordingly, because Plaintiffs cannot recover in quantum meruit or recover restitutionary damages due to unjust enrichment, summary judgment is proper.

## VI.     Conversion

Plaintiffs next claim that Defendants are liable for conversion because they wrongfully exercised control and dominion over Plaintiffs' property—the assets of Nationwide Provider.

"Conversion is the unauthorized and wrongful assumption and exercise of dominion and control over the personal property of another to the exclusion of, or inconsistent with, the owner's rights." *Texas Integrated Conveyor Sys., Inc. v. Innovative Conveyor Concepts, Inc.*, 300 S.W.3d 348, 365–66 (Tex. App. 2009) (citing *Waisath v. Lack's Stores, Inc.*, 474 S.W.2d 444, 447 (Tex. 1971); *Khorshid, Inc. v. Christian*, 257 S.W.3d 748, 758–59 (Tex. App.—Dallas 2008, no pet.)). In Texas, to prevail on a claim for conversion, the plaintiff must prove that: "(1) the plaintiff owned or had possession of the property or entitlement to possession; (2) the defendant unlawfully and without authorization assumed and exercised control over the property to the exclusion of, or inconsistent with, the plaintiff's rights as an owner; (3) the plaintiff demanded return of the property; and (4) the defendant refused to return the property." *Texas Integrated Conveyor Sys., Inc.*, 300 S.W.3d at 366 (citing *Khorshid, Inc.*, 257 S.W.3d at 759).

This claim fails on its face.  Prevailing on a claim for conversion requires that the defendant lack the legal authority to exercise control over the property.  But here, Cape Fox purchased 100% of the membership interests in Nationwide Provider vis-à-vis a valid Purchase Agreement. Defendants did not "wrongfully exercise[] dominion or control" over Plaintiffs' property because the property in question belonged (and belongs) to Defendants, not Plaintiffs.  There is therefore no genuine issue of material fact as to at least one element of conversion; accordingly, summary judgment is proper.

26

## VII.    Trespass to Real Property

Plaintiffs next claim that Cape Fox representatives, at a time when Plaintiffs owned and had lawful right to possess the real property at 2031 Clarksville St., Paris, Texas 75460, entered the same physically, intentionally, and voluntarily and caused damage and injury to Plaintiffs.

In Texas, a "[t]respass to real property is an *unauthorized* entry upon the land of another, and may occur when one enters—or causes something to enter—another's property." *Envtl. Processing Sys., L.C. v. FPL Farming Ltd.*, 457 S.W.3d 414, 422 (Tex. 2015).

After Plaintiffs decided to cease operations in Paris, Texas and move the entire Nationwide Provider operation to Manassas, Virginia, Mr. Brown and a Ms. Pardiwalla allegedly went to the Nationwide Provider office in Paris, Texas sometime in November 2014.  There, they requested keys to the office from Mrs. Lahman.  When she refused to surrender the keys, Cape Fox sent employees and a moving crew to enter the Nationwide Provider office and take business records, medical records, and credentialing records, as well as equipment and certain other company property.

Plaintiffs' ability to succeed on this claim depends, as a matter of law, on whether Defendants were authorized to enter the Nationwide Provider office building in Paris, Texas.  This in turn depends on who owned and had a right to possess the office building at the time and who owned Nationwide Provider at the time.

As discussed previously, the purchase of Nationwide Provider by Cape Fox occurred on November 26, 2013, upon the SBA's approval of the same—nearly a year before the events giving rise to this cause of action occurred.  Indeed, Mrs. Lahman transferred her membership interests in Nationwide Provider to Cape Fox at the end of January 2014.  Thus, by November 2014, the Lahmans no longer had any interest in Nationwide Provider; Cape Fox, as the owner of 100% of

the membership interests in Nationwide Provider, was legally authorized to enter property belonging to Nationwide Provider.

Moreover, and crucially, Nationwide Provider, and not the Lahmans, owned the Nationwide Provider office building at the time.  The Lahmans' assertion that they "still legally owned the property and Nationwide Provider" at this time is just incorrect.  Thus, Cape Fox owned Nationwide Provider, and Nationwide Provider owned the building.  Cape Fox representatives were thus entitled to enter the building to handle company property.  Doing so did not constitute a trespass to real property.

Accordingly, there is no genuine issue of material fact as to whether Defendants are liable for trespass to real property.  Summary judgment is proper.

## VIII.   Tortious Interference

Plaintiffs next claim that Defendants willfully and intentionally interfered with the existent and prospective business relationships of Plaintiffs.

In Texas, to prevail on a claim of tortious interference with a contract, the plaintiff must show "(1) the existence of a contract subject to interference; (2) willful and intentional interference; (3) the willful and intentional interference caused damage; and (4) actual damage or loss occurred."  *Exxon Mobil Corp. v. Rincones*, 520 S.W.3d 572, 588 (Tex. 2017) (citing *ACS Inv'rs, Inc. v. McLaughlin*, 943 S.W.2d 426, 430 (Tex. 1997)).  To prevail on a claim for tortious interference with a prospective business opportunity, the plaintiff must show:

> (1) there was a reasonable probability that the plaintiff would have entered into a business relationship with a third party; (2) the defendant either acted with a conscious desire to prevent the relationship from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct; (3) the defendant's conduct was independently tortious or unlawful; (4) the interference proximately caused the plaintiff injury; and (5) the plaintiff suffered actual damage or loss as a result.

*Coinmach Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909, 923 (Tex. 2013).

Once again, it is not entirely clear what specific acts Plaintiffs are claiming constituted tortious interference.  To the extent Plaintiffs claim that any actions in 2014 or beyond—including Cape Fox posting notice in October 2014 that it was relocating Nationwide Provider to Manassas, Virginia and contacting Nationwide Provider's clients to cancel future work—constituted tortious interference, those claims fail as a matter of law.  It is a "logically necessary rule that a party cannot tortiously interfere with its own contract."  *Holloway v. Skinner*, 898 S.W.2d 793, 796 (Tex. 1995). By 2014, Cape Fox had acquired a 100% membership interest in Nationwide Provider pursuant to the Purchase Agreement.  Thus, Cape Fox fully owned Nationwide Provider and could not as a matter of law tortiously interfere with any contracts or prospective business relations between Nationwide Provider and third parties.

Beyond that, there are no specific allegations in the Third Amended Complaint that, before taking ownership of Nationwide Provider, Cape Fox or any Defendants intentionally interfered with any of Nationwide Provider's existing contracts or reasonably likely future business relationships.  In fact, there are no specific allegations that any such contract or prospective business relationship existed in the first place that Cape Fox or any other Defendants would have even had the ability to interfere with.  Accordingly, without more, there is no genuine issue of material fact as to whether there was tortious interference here.  Summary judgment is proper.

## IX.    Breach of Fiduciary Duty

Plaintiffs next claim that Defendants breached the fiduciary duty that they owed Plaintiffs by virtue of their mentor-protégé relationship.  In Texas, to prevail on a claim for breach of fiduciary duty, the plaintiff must show "(1) the existence of a fiduciary duty, (2) breach of the duty,

(3) causation, and (4) damages." *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 220 (Tex. 2017).

In the first place, the Court is dubious about whether a fiduciary duty exists here. But the Court need not reach that question because it finds that, even if a fiduciary duty did exist, there was no breach of that duty here. Plaintiffs claim that Defendants abused their position of trust and "breached and betrayed [their] fiduciary duty to Plaintiffs" by failing to (i) "[B]e open and honest with Plaintiffs"; (ii) "Fully disclose relevant facts and motivations"; (iii) "Refrain from the use of Plaintiffs to improperly make a profit"; (iv) "Make reasonable use of the confidence Plaintiffs placed in Defendants"; and (v) "Act in the utmost good faith and exercise the most scrupulous honesty toward Plaintiffs" (Dkt. #95, ¶¶ 134–35).

The summary judgment record does not contain any evidence that Defendants failed to disclose relevant facts to Plaintiffs, that they improperly made a profit at Plaintiffs' expense, that they abused the confidence Plaintiffs placed in them, or that they otherwise acted or dealt dishonestly. Rather, the summary judgment evidence indicates that Mr. Brown and Cape Fox desired to purchase Nationwide Provider; that collectively Plaintiffs and Defendants agreed upon the terms that would govern that purchase; that Defendants furnished the Lahmans full consideration in exchange for the transfer of their membership interests in Nationwide Provider; that Nationwide Provider then employed Mrs. Lahman for a time and paid her a salary and benefits; and that, ultimately, after realizing that Nationwide Provider would not be profitable like they had hoped, Defendants ceased Nationwide Provider's operations in Paris, Texas and terminated Mrs. Lahman. That the business association between Plaintiffs and Defendants did not succeed as the parties had hoped does not mean that Defendants breached a special trust relationship, if one indeed existed, or otherwise failed to exercise the proper standard of care in their dealings with Plaintiffs.

Accordingly, without more, there is no genuine issue of material fact as to whether Defendants breached a fiduciary duty to Plaintiffs.

## X.      Intentional Infliction of Emotional Distress

Plaintiffs next claim that Defendants' conduct constituted the tort of intentional infliction of emotional distress.  In Texas, to prevail on a claim of intentional infliction of emotional distress, the plaintiff must prove that "(1) [the defendant] acted intentionally or recklessly; (2) its conduct was extreme and outrageous; (3) its actions caused [the plaintiff] emotional distress; and (4) the emotional distress was severe." *Kroger Texas Ltd. P'ship v. Suberu*, 216 S.W.3d 788, 796 (Tex. 2006) (citing *Hoffmann–La Roche Inc. v. Zeltwanger*, 144 S.W.3d 438, 445 (Tex. 2004); *Wal–Mart Stores, Inc. v. Canchola*, 121 S.W.3d 735, 740 (Tex. 2003)).  The second element is satisfied only if the conduct is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* (citing *Twyman v. Twyman*, 855 S.W.2d 619, 621 (Tex.1993) (quoting RESTATEMENT (SECOND) OF TORTS § 46 cmt. d (1965))).  "Meritorious claims for intentional infliction of emotional distress are relatively rare precisely because most human conduct, even that which causes injury to others, cannot be fairly characterized as extreme and outrageous." *Id.*; *see also Creditwatch, Inc. v. Jackson*, 157 S.W.3d 814, 815 n.1 (Tex. 2005).

After consideration of the Third Amended Complaint, the Court is of the opinion that Plaintiffs have failed to present any evidence of atrocious, utterly intolerable conduct that exceeds the bounds of decency in a civilized society.  While the Court recognizes that this case involved a failed business association, which is bound to create a certain level of distress for some or all parties involved, there is no evidence that Defendants' conduct here rose to the level of extreme and outrageous.  Moreover, there is no evidence that any of Defendants' conduct that may have

caused Plaintiffs emotional distress was done intentionally or recklessly to achieve that end.  The tort of intentional infliction of emotional distress is not just about the emotional distress the conduct causes; it is also about the outrageous manner in which it was done.  Plaintiffs have presented no evidence, and by failing to respond are presumed to have none, that Defendants intentionally or recklessly engaged in outrageous conduct, exceeding all bounds of decency in a civilized society, that caused Plaintiffs emotional distress.  Without more, there is thus no genuine issue of material fact as to whether Defendants are liable for intentional infliction of emotional distress.

**XI.    Violations of Law Regarding the Handling of Medical Records**

Plaintiffs next claim that "Defendants, through their wrongful removal of protected medical and health records, violated state and federal regulation and law, thereby exposing Plaintiffs to both monetary and legal damage" (Dkt. #95, ¶ 163).

The Court is unclear which state or federal law or regulation Plaintiffs are referring to—they failed to identify any such laws or regulations in the Third Amended Complaint.  To the extent Plaintiffs' claim somehow is for a violation of HIPAA, that claim fails as a matter of law because "[t]he Fifth Circuit has unequivocally held that HIPAA does not create a private right of action." *Walker v. Rajwani*, No. 4:16-cv-99, 2017 WL 916399, at *6 (E.D. Tex. Mar. 8, 2017) (citing *Acara v. Banks*, 470 F.3d 569, 571 (5th Cir. 2006)).  Otherwise, the Court does not see how relocating certain of Nationwide Provider's records from Paris, Texas to Manassas, Virginia could constitute a violation of state or federal law.  Again, Cape Fox *owned* Nationwide Provider at the time and thus a mere relocation of company property, without more evidence, does not amount to a violation of law.

Accordingly, without more, there is no genuine issue of material fact as to this cause of action.  Summary judgment is proper.

## XII.    Civil Conspiracy

Plaintiffs next claim that Defendants "entered into a civil conspiracy with each other and have agreed to use unlawful means to accomplish an unlawful purpose to Plaintiffs' detriment" (Dkt. #95, ¶ 145).

In Texas, to prevail in an action for civil conspiracy, the plaintiff must show the following:

> (1) a combination of two or more persons; (2) the persons seek to accomplish an object or course of action; (3) the persons reach a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts are taken in pursuance of the object or course of action; and (5) damages occur as a proximate result.

*First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 222 (Tex. 2017) (citing *Tri v. J.T.T.*, 162 S.W.3d 552, 556 (Tex. 2005)).  Actionable civil conspiracy requires "specific intent to agree to accomplish something unlawful or to accomplish something lawful by unlawful means."  *First United Pentecostal Church of Beaumont*, 514 S.W.3d at 222.

Plaintiffs do not present any evidence of a common plan among Defendants to commit an unlawful act or commit a lawful act by unlawful means.  Moreover, as discussed in the previous sections, there is no evidence that any unlawful acts were taken that could have been in pursuance of the "object or course of action" of the alleged conspiracy.  Plaintiffs therefore cannot establish the fourth element of civil conspiracy.

Simply put, there is no evidence that any conspiracy to commit an unlawful act existed among Defendants.  Summary judgment is therefore proper.

**XIII.  Single Business Enterprise Liability and Liability Arising from Joint Enterprise and/or Joint Venture**

In addition to the foregoing causes of action, Plaintiffs seek to hold all Defendants liable for the acts of the other Defendants by virtue of their relationship with one another.  Plaintiffs' attempt to do so fails on its face because, as discussed in the previous sections, there is no genuine issue of material fact as to whether Defendants are liable for any of the claims asserted by Plaintiffs.  As a result, they are not liable for each other's actions under a single business enterprise liability theory or a joint enterprise/venture theory.

**CONCLUSION**

For the foregoing reasons, it is hereby **ORDERED** that Defendants' Motion for Summary Judgment and Brief in Support (Dkt. #139) is **GRANTED**.

**SIGNED this 24th day of April, 2020.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE

34